1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

LORI SMITH,                                      No. C 11-03495 LB

                         Plaintiff,          **FINDINGS OF FACT AND**
        v.                                   **CONCLUSIONS OF LAW**

HARTFORD LIFE & ACCIDENT,

                         Defendant.
_____/

## INTRODUCTION

Plaintiff Lori Smith brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, against defendant Hartford Life and Accident Insurance Company ("Hartford") seeking reinstatement of her life insurance waiver of premium benefits. Complaint, ECF No. 1 at 14.[1]  On January 28, 2012, the court held a one-day "bench trial on the record."[2]  *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).  Having considered the administrative record, the parties' trial briefs, and the arguments that the parties made during the bench trial, the court rules that Ms. Smith is entitled to an award of benefits as set forth below.

---

[1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

[2]  The parties stipulated that the bench trial will be based on the administrative record, the parties' trial briefs, and the parties' oral argument at the bench trial.  *See* Stipulation, ECF No. 34.

**FINDINGS OF FACT**

## I. THE POLICY

Ms. Smith was an employee of Chevron Federal Credit Union ("Chevron") from 1989 (AR 409) to 2007.  Administrative Record ("AR") 409, 851, 974.  As a Chevron employee, Ms. Smith received short-term disability ("STD"), long-term disability ("LTD"), and life insurance coverage as part of the Group Insurance Policy (Number GL-689059) (the "Policy") that Hartford issued to Chevron.  AR 990-1065.

Whether an employee is "disabled" and qualifies for LTD and/or waiver of life insurance premium benefits depends on the definition of "disability" used.  The Policy defines "disability" for LTD coverage purposes, in relevant part, as the inability (due to, among other things, accidental bodily injury, sickness, or mental illness) to perform the "Essential Duties" of "Your Occupation." AR 1017-18.[3]  This is commonly referred to as an "own occupation" standard.  In the Policy, "Your Occupation" is defined as "your occupation as it is recognized in the general workplace."  AR 1020.

---

[3] Specifically, the Policy defines LTD disability as follows:

Disability or Disabled means that during the Elimination Period and for the next 60 months you are prevented by:

1.  accidental bodily injury;
2.  sickness;
3.  Mental Illness;
4.  Substance Abuse; or
5.  pregnancy,

from performing one or more of the Essential Duties of your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.

AR 1018.

UNITED STATES DISTRICT COURT
For the Northern District of California

It "does not mean the specific job you are performing for a specific employer or at a specific location."  AR 1020.  "Essential Duty" is defined as "a duty that: 1. is substantial, not incidental; 2. is fundamental or inherent to the occupation; and 3. can not be reasonably omitted or changed."  AR 1018.  Further, "[t]o be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty."  AR 1018.

In comparison, with respect to the waiver of life insurance premium benefit, "disabled" "means that You have a condition that prevents You from doing any work for which You are or could become qualified by education, training or experience and it is expected that this condition will last for at least nine consecutive months from Your last day of work as an Active Full-time Employee; or You have been diagnosed with a life expectancy of 12 months or less."  AR 1035.[4]  This is commonly referred to as an "any occupation" definition.  To qualify for waiver of life insurance premium benefits, "1. You must be less than age 60, insured and Disabled; and 2. acceptable proof of Your condition must be furnished to Us within one year of Your last day of work as an Active Full-time Employee."  AR 1035.

## II. MS. SMITH'S INJURIES AND INITIAL TREATMENT

Sometime in or around 2005-2006, Ms. Smith developed carpel tunnel syndrome and arthritis in her hands.  AR 2254-55 (describing Ms. Smith's injury history).  She underwent carpel tunnel syndrome-related surgery (performed by Dr. Brian Cable) on her right hand and/or wrist on April 16, 2006, and she had surgery on her left thumb on May 23, 2007.  AR 18, 1270-71, 2255.  Later, on March 25, 2009, Ms. Smith had surgery on her right thumb.  AR 2255.  She received physical therapy on occasion after her May 23, 2007 surgery, through April 2008.  AR 866-71.

Ms. Smith stopped working full-time after her May 23, 2007 surgery, and then returned to part-time work on August 14, 2007.  AR 16-18, 82-83, 851.  Her position at the time—Assistant Vice President, Regional Manager in Northern California—required her to "occasionally" stand and walk, to "occasionally" push, pull, lift, and carry items weighing up to 20 pounds, and to

---

[4] "Waiver of premium is a provision which allows for continued employee or Dependent life insurance, without payment of premium, while You are Disabled."  AR 1035.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    "frequently" sit and type on a keyboard.  AR 974-75.  It was estimated that 80% of the position's

2    responsibilities involved typing on a keyboard, 15% involved "paperwork," and 5% involved

3    "miscellaneous" tasks.  AR 975.  Ms. Smith stopped working completely on December 7, 2007.  AR

4    851, 974.[5]  She claimed that she was experiencing job stress due to Chevron's hostility toward her

5    after she filed a claim for workers compensation benefits.  AR 828.  Ms. Smith also made a claim for

6    workers compensation based on job stress, but that claim was denied.  AR 380.

7        She began seeing Dr. Cheri Forrester, a family practitioner, at least by December 2007 (and she

8    continued to see her through at least December 2009).  AR 294-303, 401-06, 828-37.  Dr. Forrester

9    proscribed Ms. Smith several medications for pain relief, headaches, and insomnia.  AR 294-303,

10   401-06, 828-37.

11       To help lower the amount of stress and anxiety related to the uncertainty surrounding her job and

12   the perceived mistreatment of her by Chevron, Ms. Smith began seeing Dr. Gary Rosenblatt, a

13   licensed psychologist, in February 2008 for psychotherapy treatment.  AR 841.  She also began

14   seeing Dr. Jeffrey Stevenson, an occupational medical consultant, in March 2008 for treatment

15   related to her wrists and hands.  AR 306-27, 364-90.

16   **III.  HARTFORD'S INITIAL APPROVAL OF MS. SMITH'S CLAIMS FOR STD, LTD,**

17   **AND WAIVER OF PREMIUM BENEFITS**

18       On June 19, 2008, Ms. Smith submitted a claim to Hartford for STD benefits, claiming that she

19   was disabled due to her carpal tunnel syndrome and hand arthritis.  AR 974-77.  She did not apply

20   for STD benefits sooner because she "was under the impression" that was not eligible for STD

21   benefits at the same time that she was receiving worker compensation benefits.  AR 970.  In support

22   of her claim, she submitted an Attending Physician's Statement ("APS") from Dr. Stevenson, dated

23

24       [5]  The court notes that the "Employer's Section" of Ms. Smith's STD application, which was
25   filled out by Human Resources Generalist Cecilia Gaddi, indicates that Ms. Smith's last day at work
     was December 7, 2007, but the "Employee's Section" of the application, which was filled-out by
26   Ms. Smith, indicates that her last day was December 7, 2008.  *Compare* AR 974 *with* AR 976.
     Given that Ms. Smith made her STD claim on June 19, 2008 (roughly six months before the
27   purported last day at work), the court assumes that Ms. Smith made a typographical error and that
     her last day was in December 2007, not 2008.
28

1   July 7, 2008.  AR 370.

2        After receiving Ms. Smith's STD claim, Hartford obtained the documents related to her medical

3   treatment and physical therapy.  AR 828-72.  Ms. Smith's hand surgeon, Dr. Cable, supported May

4   23, 2007 as the onset date of her disability.  AR 1233.  Her physical therapy treatment records show

5   that by December 2007, she had significantly increased strength of pinch and grip but still lacked

6   full range of movement and strength in her thumb and hand joints.  AR 868.  She also reported

7   stiffness in some joints in her fingers after prolonged activity.  AR 868.  By April 2008, while she

8   reported improved tolerance to typing on a keyboard and writing by hand, she continued to have

9   pain in her thumbs after using a computer for 30 minutes.  AR 857.  Dr. Stevenson's records

10  indicated that as of June 2008, Ms. Smith continued to have aching pain and discomfort when she

11  typed on a keyboard or grasped items.  AR 371-72.  He cleared her to return to work so long as she

12  was restricted her from doing repetitive or forceful pushing, pulling or reaching and from frequent or

13  forceful typing and grasping.  AR 371-72 (June 2, 2008 assessment); *see also* AR 376-90 (prior

14  assessments).  Subsequent assessments in July and August 2008 were similar and featured the same

15  limitations.  *See* AR 367-70.

16       By letter dated September 10, 2008, Hartford approved Ms. Smith's claim for STD benefits for

17  the period December 6, 2007 through June 18, 2008 (the maximum duration).  AR 151.  Hartford

18  also noted that her "file has been referred to LTD," so that a claim for LTD benefits could be

19  assessed.  AR 151; *see* AR 248 (letter from Hartford dated September 16, 2008 confirming the

20  referral and requesting information to process Ms. Smith's LTD claim).

21       In addition to reviewing Ms. Smith's medical records, Hartford interviewed Ms. Smith by

22  telephone on September 17, 2008.  AR 82-83.  She said that she would like to return to work but she

23  did not think that she could return to a job that required use of her hands, and her psychological

24  condition would make it hard, too.  AR 82-83.

25       By letter dated October 20, 2008, Hartford approved Ms. Smith's claim for LTD benefits.  AR

26  237-42.  Her benefit payments would continue as long as she remained "disabled" under the

27  applicable definition, but in no event beyond January 30, 2024.  AR 237-38.  The next day, Hartford

28  informed Ms. Smith that she might also be eligible for waiver of life insurance premium benefits.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   AR 980.  Hartford stated that, to make this determination, it would review the "medical

2   documentation" that she submitted for purposes of her LTD claim.  AR 980.  Hartford also stated

3   that waiver of life insurance premium benefits "will be approved if you satisfy this Policy's

4   eligibility requirements and if [it] receive[s] medical documentation that you have remained totally

5   Disabled as defined in this Policy."  AR 980.

6        Hartford interviewed Ms. Smith by telephone again on December 3, 2008.  AR 73-74.  Ms.

7   Smith stated that she still had a lot of stiffness but was in less pain than she was before the surgery.

8   AR 73.  She was able to take care of herself but she needed help buttoning things and lifting items.

9   AR 74.  She tried to stay off of the computer.  AR 74.  She was kept busy with her two dogs, and she

10  volunteered as a docent for dogs for the blind and gave tours to schoolchildren.  AR 74.  She also

11  stated that she was seeing a new psychologist, Dr. Donald Nadler, AR 73, as she had stopped seeing

12  Dr. Rosenblatt ten months earlier, AR 733.

13       On December 24, 2008, Ms. Smith submitted another APS from Dr. Stevenson, dated November

14  26, 2008, in which he noted that Ms. Smith could never lift or carry anything that weighed more

15  than 10 pounds and could only rarely lift or carry anything that weighed less than that.  AR 824-26.

16  He also noted that she could only rarely engage in "fingering/handling."  AR 826.  While Dr.

17  Stevenson did state that Ms. Smith could participate in "vocational rehabilitation services," he

18  expected her limitations to be permanent.  AR 826.  He further noted that she was depressed and

19  anxious.  AR 826.

20       On January 6, 2009, Hartford notified Ms. Smith that it had completed its review of her claim for

21  waiver of life insurance premium benefits and determined that she was eligible under the terms of

22  the Policy.  AR 873-74.  It stated that her life insurance would remain in effect "without premium

23  payment until [the] date of termination, January 31, 2024, provided [that she] remain totally

24  Disabled as defined by the Policy."  AR 873.  Hartford then provided the "any disability" definition

25  from the Policy and stated that "[p]eriodically[, it] will be requesting updated information from you

26  to verify your continued disability, and consequently your continued eligibility for the Waiver of

27  Premium benefit."  AR 873.

28  ///

UNITED STATES DISTRICT COURT
For the Northern District of California

**IV.  HARTFORD'S FURTHER INVESTIGATION OF MS. SMITH'S DISABILITY AND SUBSEQUENT DENIAL OF HER LTD AND WAIVER OF PREMIUM BENEFITS**

On January 21, 2009, Ms. Smith was examined again by Dr. Cable, and, while her left wrist was "doing quite well," she complained of pain in her right thumb and wrist. AR 1542. On March 25, 2009, Dr. Cable performed surgery on her right thumb. AR 335-37.

Hartford continued to investigate Ms. Smith's claim of disability throughout 2009. She continued to see Dr. Nadler for psychotherapy sessions, AR 1462-1469, and she continued to do volunteer work, AR 1466-1467. On July 6, 2009, Ms. Smith told Dr. Forrester that while she wanted to go back to work (although she had not yet been released to do so), thinking about the stressful and hostile environment made her feel anxious. AR 1478. And on November 11, 2009, she told Dr. Forrester that the pain occasionally wakes her up at night or bothers her in the morning, and she described it as manageable and annoying. AR 1483. Dr. Stevenson also provided another APS, this one dated September 29, 2009, in which he noted that Ms. Smith could never lift or carry anything that weighed more than 20 pounds (rather than 10 pounds, as he previously stated, AR 826) and could only rarely lift or carry anything that weighed less than that. AR 2881-82. He also noted that she could only rarely engage in "fingering/handling." AR 2882. And, while Dr. Stevenson again stated that Ms. Smith could participate in "vocational rehabilitation services," he still expected her limitations to be permanent. AR 2882. He once again noted that she was depressed and anxious. AR 2882.

Hartford also used investigators to monitor Ms. Smith. *See* AR 1441-59. Video surveillance was conducted on four days in September and October of 2009. AR 1441-59. On September 24, 2009, Ms. Smith "boarded a vehicle, walked, carried items in her hands, and moved about in apparent normal manner." AR 1452. On September 25, 2009, she "boarded and exited a vehicle, drove, walked, stood, loaded groceries, pushed a shopping cart, walked a dog on a leash, and moved about in an apparent normal manner." AR 1455. On October 12, 2009, she "walked a dog and moved about in an apparent normal manner." AR 1443. And on October 13, 2009, she "boarded and exited a vehicle, drove, walked, stood, loaded groceries, pushed a shopping cart, and moved about in an apparent normal manner." AR 1445.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

On November 20, 2009, Ms. Smith was examined by Dr. David Pang, an orthopedic surgeon. AR 2253-60.  He later issued a report regarding Ms. Smith's physical limitations that was based on his examination of Ms. Smith and medical records of Dr. Cable, Dr. Pugh, and Dr. Stevenson.  AR 2253, 2260.  After recounting her work and injury history, describing her own complaints about pain, and providing the objective results of his examination, Dr. Pang stated that Ms. Smith has "residual intermittent discomfort in both thumbs with repeated gripping, grabbing, [] holding, and pinching," "[l]imited right and left thumb motion," and "status post right and left thumb interpositional arthoplasty and status post right carpel tunnel release."  AR 2258.  Based on these physical limitations, Dr. Pang found Ms. Smith to be "precluded from repetitive gripping, grabbing, holding and pinching and repeated fine manipulation on [her] right hand," from "repeated heavy use of the [her] left hand," and from "prolonged computer work."  AR 2260.  He thus concluded that, "[a]ssuming [Ms. Smith's] job description to be accurate," Ms. Smith "will not be able to return back to and perform the full spectrum of the job activities required."  AR 2260.  Dr. Pang therefore considered Ms. Smith to be a "qualified injured worker" for purposes of vocational rehabilitation. AR 2260.

After this, on January 19, 2010, Ms. Smith was interviewed by a Hartford investigator (Clifford M'Sadoques) at her home.  AR 673-80.  She stated that she has chronic everyday pain and stiffness in her hands, fingers, and wrists, at different levels of intensity.  AR 673.  She described her pain level as changing from 2 to 7 (on a scale of 0 to 10) and stated that she suffers 1- to 4-hour-long headaches about 3 or 4 times per week.  AR 673.  She also stated that she suffered from anxiety and depression and has gone to counseling and taken medication because of it.  AR 673.  She stated that she was limited to lifting and carrying items weighing a maximum of 10 to 15 pounds and has increased pain in her hands from repetitious use.  AR 675.  She further stated that she did not have full use of her hands and fingers, as her grip strength and dexterity are lower than normal and her grasping of small objects is limited.  AR 676.  She also stated that she had difficulty writing and could not type on a keyboard for more than 10 minutes.  AR 676.  Any repetitious writing or typing was very painful within 15 or 20 minutes.  AR 676.

Based on Ms. Smith's medical records, Hartford's surveillance, and Ms. Smith's interview, Sean

Meyer, R.N., a Medical Case Manager III for Hartford sent letters to Dr. Nadler, Dr. Forrester, and Dr. Stevenson stating that Hartford was reviewing Ms. Smith's LTD claim and believed that Ms. Smith appeared to have the ability to work up to 40 hours per week in a job that required her to stand, walk, or sit for unlimited periods, to have full use of her "upper extremities," and to lift or carry items weighing 0 to 10 pounds frequently and up to 20 pounds occasionally.  AR 212-20.

After this, Hartford sought the opinions of other doctors.  In March of 2010, Hartford asked a hand surgeon, Dr. Leela Rangaswamy, to review Ms. Smith's medical records and the surveillance. AR 1392-94.  She stated that "[a]ll medical records provided by The Hartford were reviewed," but that she was not able to speak with Dr. Stevenson about Ms. Smith.  AR 1392.  After recounting what the surveillance video showed and summarizing at least some of the medical records, Dr. Rangaswamy concluded that, "[g]iven the totality of the medical evidence," Ms. Smith "has no restrictions or  limitations."  As support for her conclusion, Dr. Rangaswamy stated:

> There is no documentation of any physical findings that would preclude [Ms. Smith] from performing activities full time with no restrictions or limitations.  On 04/08/2009[,] she was doing well.  On 07/22/2009[,] she had an excellent [range of motion] on the left thumb with functional pinch strength.  She was deemed to be 'permanent and stationary' for the right thumb and was to follow[-]up with Dr. Stevenson.  The surveillance video shows her carrying, reaching, pushing[,] and pulling objects without any apparent difficulty.

AR 1394.

Hartford also asked a psychiatrist, Dr. Michael Rater, to review the records and surveillance in March 2010 as well.  AR 1395-99.  Like Dr. Rangaswamy, Dr. Rater stated that "[a]ll medical records provided by The Hartford were reviewed."  AR 1395.  Dr. Rater was able to speak to Dr. Nadler about Ms. Smith.  AR 1395.  After recounting his conversation with Dr. Nadler and what the surveillance video showed and summarizing at least some of the medical records, Dr. Rater concluded that, "[g]iven the totality of the medical information[,] including the activities demonstrated on video surveillance and other information provided, there is not medical evidence to support any restrictions and limitations from a psychiatric perspective."  AR 1397.  In support of his conclusion, Dr. Rater stated:

> Prima Medical Group records indicate that Ms. Smith is treated in late 2007 and early 2008 for depression and anxiety symptoms with medication and counseling referral.  She is not seen in the clinic from June 2008 to February 2009[,] at which

UNITED STATES DISTRICT COURT
For the Northern District of California

C 11-03495 LB
FINDINGS OF FACT AND CONCLUSIONS OF LAW

time she is doing better with her anxiety[,] and this continues through June 2009 and November 2009. She has no significant anxiety or depression complaints.

On March 10, 2008[,] Dr. Stevenson notes that Ms. Smith has an injury claim and a separate stress claim. "She is concerned about having been counseled in a cafeteria with a number of other people around." On discussion[,] she is pleasant and lucid. Her thought content is pleasant and appropriate. She becomes somewhat anxious in proportion to the overall nature of the issues at hand. Dr. Stevenson reports that he will focus on her hand claim and not stress claim. Dr. Stevenson follows Ms. Stevenson through the fall of 2009[,] and she is alert and lucid and collaborative at appointments.

Dr. Rosenblatt writes a letter dated March 28, 2008 stating that he has been treating Ms. Smith for anxiety since February 2008. Her "difficult relationship with her employer" is referenced. Dr. Rosenblatt sees her in counseling [from] February through June 2008[,] and he writes summarizing notes stating that Ms. Smith reports anxiety at work and he works with her on learning coping skills. Dr. Rosenblatt writes that she is less anxious on January 6, 2009. She continues to do well in February 2009 and discusses volunteer activities. She is seen through March 2009 with brief notes indicating that she has some resentment thoward [her] employer but is doing well overall. She continues to be seen in May 2009, and the notes indicate that she discusses themes of acceptance, and she works on staying active. She reports headaches. She is not sleeping well. She is a "good tired" and had a busy weekend in June 2009. She stays busy through July 2009. She continues to be seen twice monthly, and Dr. Stevenson leaves brief notes. On October 27, 2008[,] she is doing pretty well and is focused on the positive. She continues to do well by January 2010. Besides resentment of her employer, which is not due to a psychiatric condition, there is no evidence presented in Dr. Rosenblatt's records to support emotional, behavior, or cognitive problems limiting or restricting Ms. Smith's ability to work.

Dr. Nadler, in a brief report in February 2010, and in our telephone consultation[,] states that Ms. Smith is fine as long as stress is reduced and she can do things on her schedule such as her volunteer work. He discusses his anticipation that she will not do well with stress. He reports that she has been in the emergency room with panic attacks. There are no records to support these concerns. The medical records do not support psychiatric impairment.

AR 1398.

By separate letters dated March 30, 2010, Hartford told Ms. Smith that it had determined that she no longer qualified for LTD and waiver of life insurance premium benefits because she was no longer "disabled" under the applicable definitions. *See* AR 198-20 (LTD), 763-68 (waiver of life insurance premium). In the letter regarding Ms. Smith's waiver of life insurance premium benefits, Hartford states that "[a]ll of the documents contained in her file were viewed as a whole." AR 764. These documents apparently included: (1) the LTD application that Ms. Smith completed on September 20, 2008; (2) Dr. Stevenson's APSs dated July 7, 2008, November 26, 2008, and September 29, 2009; (3) information completed by Chevron on June 18, 2008; (4) a Claimant

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Questionnaire that Ms. Smith completed on September 10, 2009; (5) video and report for

2   surveillance conducted by Access Investigations on September 24, 2009, September 25, 2009,

3   October 12, 2009, and October 13, 2009; (6) Ms. Smith's interview with Hartford Investigator,

4   Clifford M'Sadoques on January 19, 2010; (7) medical records received from Dr. Cable, Dr.

5   Stevenson, Dr. Forrester, and Dr. Nadler; (8) responses received from Dr. Forrester and Dr. Nadler;

6   (9) the "Independent Medical Review" conducted by Dr. Rangaswamy on March 26, 2010; (10) the

7   "Independent Medical Review" conducted by Dr. Rater on March 26, 2010; and (11) the review

8   conducted by the Hartford's Medical Case Manager on March 29, 2010.  AR 764.  Hartford goes on

9   to discuss the various documents, stating in relevant part:

10         We received an Attending Physician's Statement of Disability completed by Dr.
       Stevenson on November 26, 2008, which indicated your diagnosis was bilateral wrist
11         carpal sprain and you were restricted to rarely lifting more than 10 pounds and rarely
       fingering and handling.

12         Dr. Stevenson also completed an Attending Physician's Statement of Disability,
13         dated September 29, 2009, which indicated your diagnosis as carpal tunnel syndrome
       and arthritis.  The form confirmed you are able to rarely lift up to 20 pounds and
14         occasionally finger and handle.

15         You completed a Claimant Questionnaire in September 2009 on which you
       indicated you were disabled due to osteoarthrosis, depression and anxiety.  You
16         stated your symptoms included pain and stiffness in your hands, which made it
       difficult to write, use computer, grasp and pick up fine objects and depression and
17         anxiety affect your mood and concentration.  You advised that at times you need
       assistance with buttons and opening containers and jars.  You stated you have not
18         been reading books due to concentration difficulty but you could read short articles
       and your husband assists with cooking.

19         In order to obtain a better understanding of your capabilities, video surveillance
20         was conducted on September 24, 2009, September 25, 2009, October 12, 2009 and
       October 13, 2009.  On September 24, 2009, you were observed walking through a
21         farmer's market with a large bag on your forearm.  You were also observed going to
       a grocery store and exiting carrying a bag.  On September 25, 2009, you were
22         observed arriving at an assisted living facility, parking your car and walking a dog on
       a leash up to the building.  On this day, you were also observed going to a grocery
23         store, and exiting pushing a cart with a few bags in the cart.  You were observed
       unloading the items from the bags one by one into your vehicle.  You were also
24         observed going to a different grocery store and exiting pushing a cart and loaded the
       bags/items into your vehicle.  On October 12, 2009, you were observed walking a
25         dog on a leash around your neighborhood.  On October 13, 2009, you were observed
       going to several locations including a gas station, bank, medical building and a
26         cellular phone store.  You were observed holding an umbrella while crossing a street
       on a windy and rainy day.  You were also observed going to a grocery store where
27         you exited pushing a cart and unloaded bags and a pumpkin into the backseat of your
       car.  You returned home and parked on your street and carried a pumpkin and several
28         other items into your residence.

UNITED STATES DISTRICT COURT
For the Northern District of California

In order to resolve the discrepancies between your observed activities, as documented in the abovementioned video activities checks, and your reported limitations, Hartford Investigator, Clifford M'Sadoques, scheduled an interview with you for January 19, 2010. In your interview statement, you stated you were unable to work due to constant, chronic pain and stiffness in your hands, fingers and wrists, which vary in pain intensity. You also stated you suffer from headaches three to four times per week which you believe are caused by your anxiety issues. You stated you suffer from anxiety and depression due to your illness, pain and change in quality of life. You advised your pain is generally aggravated by any physical activity, especially repetitive movements, lifting, writing, chopping, etc.

You were asked to describe your maximum level of functionality. You advised Mr. M'Sadoques you were able to lift and carry items up to a maximum weight of 10-15 pounds for a short lift such as lifting your dog from the floor to the couch. You could lift light grocery bags, about five pounds each, from your car to your home however, you try to limit these activities as this increases the pain in your hands. You indicated to Mr. M'Sadoques that you were able to push and pull something that offers light to moderate resistance, such as a shopping cart but usually no more than 10 minutes at a time and you shop more frequently so you have fewer items at one time. You stated you could reach but reaching above your shoulder causes pain in your hands. You advised you do not have full use of your fingers and hands and your grip strength is much less than normal due to the pain and decreased usage. You cannot open most jars or bottles, you have decreased dexterity and have difficulty using your hands for fine movements and grasping. Any repetitious writing or typing causes an increase in your pain. You also advised you have problems concentrating due to your pain issues, anxiety and depression.

After reviewing the statements you provided to Mr. M'Sadoques, we felt that additional clarification of your medical condition was necessary as your self-reported limitations and restrictions were not consistent with your observed activities. Therefore, your claim was referred to our Medical Case Manager. As part of their review, the Medical Case Manager attempted to contact your treating physicians to request clarification of your functional abilities and your ability to perform a full-time occupation. Dr. Stevenson, Dr. Forrester and Dr. Nadler were provided with copies of your surveillance as well as your interview statement. Also at that time, your updated medical records were requested and received from all of these physicians as well as from Dr. Cable.

The Medical Case Manager sent a letter to Dr. Stevenson and Dr. Forrester, stating in part, that based on the medical information, it is our opinion that you have the ability to function up to 40 hours per week with capabilities that would include standing, walking and/or sitting unlimited throughout the day (afforded will be the opportunity to change body positions/postures for comfort by walking, standing or moving about), full use of the upper extremities, lifting/carrying up to 10 pounds on a frequent basis and up to 20 pounds occasionally. Dr. Stevenson did not respond to our request for comment regarding your functionality. Dr. Forrester responded indicating she had been seeing you for preventative care; anti-depressants and issues unrelated to your hands and could not respond to the questions.

The Medical Case Manager also sent a letter to Dr. Nadler stating that, based on the information in your claim, including psychiatric records, surveillance activity information and your self-reported capabilities, it is our assessment that you appear to have the ability to function up to 40 hours per week and demonstrate the ability to: Direct, control and plan activities for others, perform a variety of duties, perform under stress, perform repetitive work, influence others, work alone, attain precise set

limits, work under instructions, deal with people, make judgments, express your personal feelings and be reliable and consistent.  Dr. Nadler responded and indicated he did not believe you had the ability to function as described above.  He stated that restrictions include time limitations (a few hours) in non-stressful situations.

To obtain further clarification of your medical condition, your file was referred to MES Solutions for an independent medical review.  Your file was reviewed by Dr. Leela Rangaswamy, Board Certified in Orthopaedic Surgery with Added Expertise in Hand Surgery and Dr. Michael Ratner, Board Certified in Psychiatry.[6]  Dr. Rangaswamy attempted to contact Dr. Stevenson on March 17, 2010, March 18, 2010 and March 19, 2010, however was not able to establish contact with him.

After reviewing the medical records, surveillance video and interview statement, it is in Dr. Rangaswamy's medical opinion that you do not have any restrictions and limitations preventing you from performing the duties of Your Occupation.  Based on Dr. Rangaswamy's review, she indicated there is no documentation of any physical findings that would preclude you from performing activities full time with no restrictions or limitations.  An April 8, 2009 examination with Dr. Stevenson noted you were doing well.  A July 22, 2009 office visit note indicated you had excellent range of motion on your left thumb with functional pinch strength.  You were deemed to be "permanent and stationary" for the right thumb and were to follow up with Dr. Stevenson.  Dr. Rangaswamy stated that in combination with the lack of physical findings and the surveillance video, which shows you carrying, reaching, pushing and pulling objects without any apparent difficulty, you do not have any restrictions or limitations preventing you from working full time.

Dr. Michael Ratner, Board Certified in Psychiatry, also reviewed your claim from a mental health perspective.  He contacted Dr. Nadler and was able to speak with him about your condition.  Dr. Nadler indicated that he did not review the surveillance information but read the reports and stated it was clear that you could do some limited daily activities on a somewhat limited basis.  In his understanding, there is a medical concern about you going back to work with your surgery but he could not comment on that aspect.  Dr. Nadler stated you are not prepared to go back to work and you are fragile as far as pressure and complexity are concerned and your focus and concentration have limitations.  He stated you have the propensity to react emotionally and ended up with panic reactions and emergency room visits.  He stated you could do a variety of activities for a few hours here and there and you could handle volunteer activities but you are not ready to deal with the pressure of extended concentration.  He stated an estimate of a possible return to work would be within a year.

After reviewing the medical records, surveillance video, interview statement and conversation with Dr. Nadler, it is Dr. Ratner's medical opinion that you do not have any restrictions or limitations from a psychiatric standpoint as there is little to no medical evidence to support any restrictions or limitations.  As per review of the records by Dr. Ratner, he indicated that Prima Medical Group records indicated you were treated in late 2007 and early 2008 for depression and anxiety with medication and a counseling referral.  You were not seen in the clinic from June 2008 to February 2009, at which time you were doing better with your anxiety and this status continued through June 2009 and November 2009.  It was noted you have no

---

[6] Hartford's letter used the name "Ratner," but the documents submitted by this doctor were signed by Dr. "Rater."

significant anxiety or depression complaints.

Dr. Ratner stated that on March 10, 2008, Dr. Stevenson noted that you had an injury claim and a separate stress claim. Dr. Stevenson noted that you were concerned about having been counseled in a cafeteria with a number of other people around. However, during discussion, you were pleasant and lucid with pleasant and appropriate thought content. You became somewhat anxious in proportion to the overall nature of the issues at hand but continued to be followed by Dr. Stevenson for your hand injury. Through the fall of 2009 office visits with Dr. Stevenson noted you were alert, lucid and collaborative at appointments.

Per review of Dr. Rosenblatt's records that were previously received in your file, Dr. Ratner indicated that in a letter dated March 28, 2008 composed by Dr. Rosenblatt, it was indicated he had been treating you for anxiety since February 2009 and referenced your difficult relationship with your employer. Dr. Rosenblatt also indicated in January 2009 that you were less anxious and further treatment notes through 2008 indicated you continued to do well. Other additional medical records from Dr. Rosenblatt and Dr. Stevenson noted that you continued to do well through January 2010. Besides resentment of your employer, which is not due to a psychiatric condition, there is no evidence presented in Dr. Rosenblatt's records to support emotional, behavioral or cognitive problems limiting or restricting your ability to work. There is also no documentation on file that indicates you were seen in the emergency room for panic attacks.

We have determined from the combination of all the medical records, activities documented on surveillance and your statements taken during your interview that you do not have any restrictions from a physical or psychiatric standpoint. Therefore, you no longer meet the definition of Disabled as defined in this policy.

AR 764-68.

In the letter regarding Ms. Smith's LTD benefits, Hartford relied on the same explanation its provided in its letter regarding her waiver of insurance premium (and which is quoted above), but noted at the end that, rather than determining that Ms. Smith could perform "any occupation" (the definition of "disability" for purposes of the waiver of life insurance premium), it determined that she could perform the "Essential Functions" of her "own occupation" (the definition of "disability for purposes of LTD). AR 203.

## V. MS. SMITH'S AWARD OF SOCIAL SECURITY DISABILITY BENEFITS

Starting on March 26, 2010, Ms. Smith began seeing Dr. Ruben Kalra, a pain medicine consultant and anesthesiologist (and she continued to see him until at least October 8, 2010). AR 510-26. Over this time, although she stated that she was "doing well," AR 513, 516, she still reported having numbness and tingling in her right thumb and adjacent finger, AR 513. By May 21, 2010, Dr. Kalra believed that, in addition to her continuing pain medications, she might benefit from

"transcutaneous electrical neurostimulation as a physical therapy modality."  AR 517.

Shortly before seeing Dr. Kalra, in January 2010, Ms. Smith filed a claim for Social Security Disability benefits.  AR 353-54.  On August 27, 2010, an administrative law judge ("ALJ") issued a notice of decision awarding her benefits of $2,127 per month.  AR 2184-2192.  The ALJ found that Ms. Smith has the following severe impairments: bilateral carpel tunnel, osteoarthritis, status post bilateral carpel tunnel release, status post bilateral wrist ligament reconstruction and tendon interposition, affective disorder, and anxiety-related disorder.  AR 2189.  The ALJ also found that she has the residual functional capacity to perform sedentary work (as defined in 20 C.F.R. § 404.1567(a)), except that she can engage in tasks requiring use of her hands frequently but not constantly, and that she retains the abilities to engage in simple, repetitive tasks equating to unskilled work.  AR 2189.  The ALJ further found that she could not perform her past relevant work (as defined in 20 C.F.R. § 404.1565) and that, considering her age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that she can perform.  AR 2190-91.  Therefore, the ALJ found Ms. Smith "disabled" (as defined in the Social Security Act) since December 15, 2007 (the last day she engaged in substantial gainful activity).  AR 2191.

## VI.  MS. SMITH'S APPEAL AND HARTFORD'S SUBSEQUENT REINSTATEMENT OF LTD BENEFITS (BUT NOT OF WAIVER OF LIFE INSURANCE PREMIUM BENEFITS)

By letter dated September 23, 2010, Ms. Smith appealed the denial of her LTD and waiver of life insurance premium benefits.  AR 529-626 (letter, excluding accompanying exhibits).  Generally speaking, the letter (1) argued that Hartford was required to follow California insurance law regarding the meaning of any occupation and own occupation, that those standards were saved from preemption from ERISA, that Hartford's decision terminating benefits was contrary to the evidence, (2) noted and discussed Ms. Smith's Social Security disability award, and (3) argued that Hartford was judicially estopped from disputing that Ms. Smith was entitled to both LTD and waiver of life insurance premium benefits.  AR 529-626.  It also stated that Hartford failed to have Ms. Smith examined, improperly considered only objective medical evidence, and failed to consider pain, the side effects of medication, and mental clouding as disabling conditions.  AR 529-626.  The letter

1    also discussed Hartford's surveillance of Ms. Smith and why it demonstrated nothing of substance.

2    AR 529-626.  It also evaluated the medical reviews of Dr. Rangaswamy and Dr. Rater and argued

3    that their conclusions were invalid.  AR 529-626.  The letter also noted that Hartford failed to

4    perform any employability analysis of Smith and that her fingering limitations, alone, preclude her

5    from any occupation.  AR 529-626.  The letter further noted that Hartford terminated Ms. Smith's

6    benefits with no change in her conditions, that its own claims manual demonstrated its decision was

7    unjustified and its procedures were unfair, and that its physician reviews were so flawed they would

8    not be admissible in court.  AR 529-626.

9         In addition, attached to the appeal letter was, among other things, a declaration from Ms. Smith,

10   an analysis by a vocational consultant, Martin Brodzinsky, M.A., and a progress report, dated

11   August 21, 2009, from Dr. Stevenson.  AR 2194-99 (Smith Declaration), 2238-40 (Stevenson

12   report), 2758-74 (Brodzinsky analysis).  In her declaration, Ms. Smith described her job

13   responsibilities at Chevron, her medical status and condition, the medications she takes, what she did

14   in her typical day, and how her inability to work has caused anxiety and depression.  AR 2194-97.

15   She explained that she could not work in her own occupation because of the following: she cannot

16   perform repetitive motions with her hands; cannot type on a keyboard for more than ten minutes at a

17   time because the pain makes it impossible to continue; pain from typing on a keyboard lasts several

18   hours (often for the rest of the day); as a result of the pain she was prescribed narcotic pain and

19   antidepressant medication which makes her very drowsy; she is unable to maintain concentration

20   and memory for extended periods of time (she does not know if it's related to pain medications or

21   her mental condition, or to pain); and her hand strength is significantly diminished.  AR 2197-98.

22        Mr. Brodzinsky provided an assessment of Ms. Smith's ability "to physically perform her own

23   occupation, based upon the medical reports . . . her job description, the Hartford's definition of

24   disability and testing conducted by" Ms. Smith's attorney.  AR 2758.  After summarizing the

25   medical reports, noting Ms. Smith's job responsibilities and duties, and discussing his own

26   vocational testing of Ms. Smith, Mr. Brodzinsky concluded that, "based upon the terms of Ms.

27   Smith's policy, and by my understanding of California law, [Ms. Smith] is unable to perform her

28   work eight hours a day, five days a week, week[-]in and week[-]out, due to the continued disability

to her bilateral hands, as documented in medical reports."  AR 2770.

In addition, Dr. Stevenson's August 21, 2009 progress report noted that while Ms. Smith had made "gradual improvement" since her last surgery and "was not having trouble with carpel tunnel symptoms or numbness [or] tingling," she "still has reduced grasp and pinch and has trouble with fine handling such as [with] buttons and pins."  AR 2238.  Dr. Stevenson believed that she could be "available for modified duty as long as there is minimal handling [and] grasping, and no repetitive [typing on a keyboard]."  AR 2239.

Hartford considered Mr. Smith's appeal.  At Hartford's request, on December 9, 2010, physical medicine and rehabilitation specialist Dr. Stephen Lobel, after reviewing "all information, records[,] and data provided to me by The Hartford Life Insurance Companies" and discussing Ms. Smith's condition with Dr. Stevenson, provided his opinion regarding Ms. Smith's restrictions and limitations as of April 1, 2010.  AR 489-96.  He determined that Ms. Smith "can sit, stand[,] and walk without restriction for up to eight hours in an eight hour day; reach[] at shoulder level, above shoulder level, [] waist level and below waist level [] without restriction for up to eight hours in an eight hour day; and handle, finger, feel[,] and engage in repetitive hand movement ten minutes per hour for up to two and half hours a day in an eight hour day."  AR 493.  He then concluded that Ms. Smith is "capable of sustaining a full time work capacity as of 04/01/2010" within the limitations described above.  AR 493.

Also at Hartford's request, on December 13, 2010, psychiatrist Dr. Kenneth Marks, after reviewing "all information, records[,] and data provided to me by The Hartford Life Insurance Companies" and discussing Ms. Smith's condition with Dr. Nadler, also provided his opinion regarding Ms. Smith's restrictions and limitations as of April 1, 2010.  AR 479-84.  He determined that, "[b]ased on the medical evidence reviewed[,] there are no documented signs of any type of psychiatric impairment(s) that would support significant limitations that would interfere with [Ms. Smith's] ability to work."  AR 481.  He also determined that she "has no significant limitations as a result of side effects from medication."  AR 481.  And, '[e]ven though [Dr. Nadler] state[d] that [Ms. Smith] is depressed [and] anxious, is in emotional distress [in relation] to her upper extremity pain and employer intimidation related to her 'disability,' [] that [she] has difficulty concentrating

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   for more than a few hours[,] and that [she] can be emotionally . . . when stressed, there is no

2   objective testing or notation to support these claims."  AR 481-82.

3        After Dr. Marks provided his opinion, Dr. Nadler responded by stating that Ms. Smith "remains

4   emotionally distressed and is unable to deal with stress and emotional experiences in a controlled

5   manner."  AR 488.  Dr. Marks considered Dr. Nadler's response, but it did not alter his conclusion.

6   AR 484.

7        On December 15, 2010, Hartford employee Stacy Sletten prepared an "Employability Analysis

8   Review."  AR 29, 722-723.  She based her evaluation on the opinions of Dr. Lobel and Dr. Marks.

9   AR 723.  Ms. Sletten determined that Ms. Smith is capable of sitting, standing, and walking without

10   restriction for up to eight hours in an eight hour day, carrying and lifting up to 10 pounds frequently

11   and 20 pounds occasionally, and pushing and pulling up to 50 pounds occasionally.  AR 722-23.

12   She further determined that Ms. Smith is capable of bending, twisting, balancing, squatting,

13   crouching, stooping, and reaching at waist level, that she can feel, manipulate, handle, grip, and

14   grasp items for up to two and a half hours in an eight hour day, and that she has no psychological

15   impairments impacting her ability to work.  AR 723.  Therefore, Ms. Sletten concluded that Ms.

16   Smith would be able to perform entry level positions that would only require on the job training, and

17   she identified museum attendant, case aid, food-management aid, guide, weight reduction specialist,

18   and car operator.  AR 723.

19        By separate letters dated December 21, 2010, Hartford told Ms. Smith that upon review of her

20   appeal and the claim file (which included unspecified  "additionally submitted information and

21   information [Hartford] obtained") it had determined that she did, in fact, qualify for LTD benefits

22   but that she did not qualify for waiver of life insurance premium benefits.  *See* AR 182 (LTD), 758-

23   61 (waiver of  life insurance premium). In the letter regarding Ms. Smith's LTD benefits, Hartford

24   stated that its review "found that the information in [Ms. Smith's] file supports [that] Ms. Smith

25   continued to meet the ['own occupation'] definition of Disability . . . ."  AR 182.

26        In the letter regarding Ms. Smith's waiver of life insurance premium benefits, Hartford stated

27   that it reviewed her appeal and her "claim file in its entirety including the caselaw cited in [her]

28   appeal letter," and it determined that "the documentation in he claim file, taken as a whole, does not

support that she has a condition that prevents her from doing any work for which she is qualified by education, training[,] or experience as of April 1, 2010." AR 758. Hartford provided the following explaination:

> Documentation provided in the claim file indicates Ms. Smith ceased performing the essential duties of her occupation due to Bilateral Carpal Tunnel Syndrome. She also reported work related stress, depression and anxiety. Following a review, it was determined on [sic] that Ms. Smith was eligible for the Waiver of Premium benefit and her claim was approved. An activities check utilizing video surveillance was conducted and Ms. Smith participated in an in-person interview with an investigator. To gain a better understanding of her functional capabilities, an independent peer review was conducted by Dr. Leela Rangaswamy, Board Certified in Orthopaedic Surgery with Added Expertise in Hand Surgery, who opined that Ms. Smith did not have any physical restrictions and limitations that would preclude her from performing activities full time. An independent peer review was also conducted by Dr. Michael Rater, Board Certified in Psychiatry who opined that Ms. Smith did not have any restrictions or limitations from a psychiatric standpoint. Following a review of the claim file, it was determined Ms. Smith was no longer eligible for Waiver of Premium benefits beyond March 31, 2010.

> Please refer to our correspondence dated March 30, 2010 (copy enclosed) which lists the Policy provisions that apply to Ms. Smith's claim and the rationale for terminating her claim. In addition to the documentation previously reviewed, we also considered the following information:

> • Letter from Robert J. Rosati dated September 23, 2010 received in our office on September 23, 2010

> The September 23, 2010 letter indicates disagreement with terminating the Waiver of Premium claim noting that Ms. Smith continues to be disabled due to osteoarthritis, carpal tunnel syndrome, anxiety, depression and the effects each of these conditions has singularly and in combination with each other. It is also noted that Ms. Smith has been awarded Social Security Disability Insurance benefits.

> We reviewed Ms. Smith's claim and the appeal letter, and we note that she has been approved for Social Security Disability Insurance benefits (SSDI). However it is possible to qualify for SSDI but no longer continue to qualify for private waiver of premium benefits from The Hartford. The standards governing receipt of these public and private benefits are different in critical ways. In determining entitlement to SSDI, the Social Security Administration (SSA) measures an individual's condition against a unique set of federal criteria. By contrast, the continuing validity of a claim to benefits under a private policy depends in part on the interpretation of the specific terms in the policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive. Waiver of premium benefits is under a contract that must be consistently enforced according to its terms. The following will help to explain why The Hartford reached a different conclusion than the SSA regarding Ms. Smith's Waiver of Premium benefits.

> Social Security Administrative Law Judges are required to give special weight to the opinion(s) of an individual's treating physician(s), while LTD and Life carriers are not bound by this requirement. The Hartford is not required to credit the opinions of treating physicians over other evidence. SSA may also weigh subjective evidence

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

differently.  For example, because SSA gives full deference to a treating physician, if a claimant subjectively reports certain restrictions, or limitations (e.g., pain levels) to his/her treating physician, and the treating physician includes the claimant's subjective complaints in his/her assessment, those subjective complaints may carry greater weight in an SSA determination than in The Hartford's determination.  The SSA does not conduct analysis of skills that may be transferable to other occupations.  The Hartford does a transferable skills analysis to determine whether an individual's prior experience and skill set would allow him/her to perform an occupation with minimal on-the-job training.

For further clarification of Ms. Smith's functional capabilities as of April 1, 2010, it was determined that independent peer reviews were needed.  Dr. Stephen M. Lobel, Board Certified in Physical Medicine & Rehabilitation/Pain Medicine, reviewed the medical information contained in her claim file and spoke with Dr. Stevenson about Ms. Smith's condition and functionality.  Dr. Lobel also attempted to reach Dr. Kalra by telephone but was unsuccessful, however Dr. Kalra responded to Dr. Lobel's faxed questions.  Dr. Lobel opined that as of April 1, 2010 Ms. Smith was capable of sustaining a full time work schedule with specific restrictions and limitations.  Dr. Lobel noted Ms. Smith's maximum physical functional abilities were sitting, standing, and walking without restriction for up to eight hours in an eight hour day; reaching at shoulder level, above shoulder level, at waist level and below waist level and above shoulder level without restriction for up to eight hours in an eight hour day; handle, finger, feel and engage in repetitive hand movement ten minutes per hour for up to two and a half hours a day in an eight hour day.

For this appeal review the opinion of Dr. Lobel will be used as the restrictions and limitations provided appear consistent with the medical evidence and are also consistent with the restrictions and limitations provided by Dr. Stevenson.

Dr. Kenneth J. Marks, Board Certified in Psychiatry & Neurology/Psychiatry, reviewed the medical information contained in her claim file and attempted to reach Dr. Nadler to discuss Ms. Smith's condition and functionality.  Although Dr. Nadler did not return Dr. Marks'[s] telephone messages, Dr. Nadler did respond to faxed questions.  Dr. Marks opined there is a lack of psychiatric testing to support Ms. Smith's subjective complaints.  Dr. Marks also notes her symptoms are not clinically supported by any other providers' progress notes.  He further states that of the notes reviewed, there are no noted signs of any type of psychiatric decompensation, using standard techniques of measurement, that show cognitive impairment or that demonstrates that Ms. Smith is psychiatrically impaired as of April 1, 2010.  Dr. Marks states Ms. Smith is not noted to be suicidal, homicidal, psychotic manic, a danger to herself or others, unable to care for herself, or to have any type of cognitive impairment that would interfere with her employment.

As there is a lack of evidence to support Ms. Smith's psychiatric symptoms, Dr. Nadler's opinion is not supported by the evidence in the file.  Therefore for this appeal review, the opinion of Dr. Marks was used and Ms. Smith's symptoms will not be considered to be of such a severity to impair her functionality.

To remain eligible for the Waiver of Premium benefit beyond March 31, 2010 Ms. Smith must have a condition that prevents her from doing any work for which she is or could become qualified by education, training or experience and it is expected that this condition will last for at least nine consecutive months from her last day of work; or she has been diagnosed with a life expectancy of 12 months or less.

1    As of April 1, 2010 Ms. Smith could work full time however she had specific
2    restrictions and limitations.  To better understand if these restrictions/limitations
     would prevent her from doing any work, the file was referred to Hartford's
3    Rehabilitation Clinical Case Manager (RCCM) for an Employability Analysis Report
     (EAR).  The RCCM reviewed Ms. Smith's education background, vocational
4    background, and her functional capabilities as of April, 2010.  RCCM opined that
     Ms. Smith would be able to perform the following restrictions within her restrictions:
5    Museum Attendant, Case Aide, Food-Management Aide, Guide, Weight-Reduction
     Specialist, and Call-Out Operator.  These are entry level positions that would only
6    require on-the-job training.

7    Based on the contractual provisions of the Chevron Federal Credit Union policy
     regarding the Waiver of Premium benefit; and the documentation contained in Ms.
8    Smith's claim file, taken as a whole, our determination remains that the medical
     evidence does not support her conditions were of such a severity to prevent her from
9    doing any work for which she is or could be come qualified by education, training or
     experience.  As such, Ms. Smith did not continue to remain eligible for the Waiver of
10   Premium benefit beyond March 31, 2010 and the decision to terminate the claim was
     appropriate and will stand.

11   AR 758-61.

12                               **CONCLUSIONS OF LAW**

13   **I.  LEGAL STANDARD**

14        Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a

15   jury . . . , the court must find the facts specially and state its conclusions of law separately.  The

16   findings and conclusions may be stated on the record . . . or may appear in an opinion or a

17   memorandum of decision filed by the court.  Judgment must be entered under Rule 58."  In doing so,

18   the court does not determine whether there is an issue of material fact, but whether the plaintiff is

19   disabled under the policy.  *See Kearney*, 175 F.3d at 1095.  The court is to "evaluate the

20   persuasiveness of conflicting testimony," and make findings of fact.  *Id.*  This particular trial is

21   considered a "bench trial on the record," which may "consist[ ] of no more than the trial judge

22   rereading [the administrative record]."  *Id.*

23        It is Ms. Smith's burden to show beyond a preponderance of the evidence that she was disabled

24   under the terms of the Plan during the claim period.  *See Finley v. Hartford Life & Acc. Ins. Co.*, No.

25   06-6247, 2007 WL 4374417, at *7 (N.D. Cal. Dec. 14, 2007); *Sabatino v. Liberty Life Assurance*

26   *Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The standard of review for Hartford's denial of coverage is abuse of discretion.[7]  A challenge to

2    an ERISA plan's denial of benefits under 29 U.S.C. § 1132(a)(1)(B) is reviewed for abuse of

3    discretion if the plan gives the administrator discretionary authority to construe the terms of the plan.

4    *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (abrogated on other

5    grounds); *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  It is undisputed that

6    discretionary authority was provided by the Policy here.  AR 1038 ("We [Hartford] have full

7    discretion and authority to determine eligibility for benefits and to construe and interpret all terms

8    and provisions of the Policy.");  Ms. Smith's Opening Brief, ECF No. 26 at 12; Hartford's Opening

9    Brief, ECF No. 27 at 19.

10   **II.  DISCUSSION**

11       **A.  The *Erreca* Standard Does Not Apply**

12       The first issue the court must address is whether the Policy's "any occupation" standard of

13   disability applies.  Ms. Smith argues that the "any disability" standard in the Policy does not apply

14   and that a less broad standard, established in *Erreca v. W. States Life Ins. Co.*, 19 Cal. 2d 388,

15   394–95 (1942), applies.  Plaintiff's Opening Brief, ECF No. 26 at 15-18.  Hartford argues that the

16   Policy's standard applies because this action arises under ERISA.  Defendant's First Reply Brief,

17   ECF No. 37 at 8.

18       Under California law, a "total disability" in an "any occupation" policy means "a disability

19   which prevents the insured from working with reasonable continuity in his customary occupation or

20   in any other occupation in which he might reasonably be expected to engage in view of his station

21   and physical and mental capacity."  *Erreca*, 19 Cal. 2d at 394–95.  An insured's ability "to perform

22   sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of the

23   business" does not preclude recovery under a policy applying an "any occupation" standard.  *Id.*; *see*

24   *also Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1006 (9th Cir. 2004) (under

25   the *Erreca* standard, a claimant is eligible for benefits if he or she is unable to perform the

26

27

28       [7] The parties agree.  *See* Plaintiff's Opening Trial Brief, ECF No. 26 at 12; Defendant's
     Opening Trial Brief, ECF No. 27 at 20.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    substantial and material duties of his or her own occupation in the usual and customary way with

2    reasonable continuity).

3        The *Erreca* standard, however, does not apply in ERISA cases because it is preempted.  Under

4    29 U.S.C. § 1144, any state law that "relate[s] to . . . employee benefit plan[s]" is preempted by

5    ERISA.  29 U.S.C. § 1144(a).  The savings clause excepts from preemption any law that "regulat[es]

6    insurance."  29 U.S.C. § 1144(b)(2)(A).  To fall under ERISA's savings clause, a state law must be

7    "specifically directed toward entities engaged in insurance" and "substantially affect the risk pooling

8    arrangement between the insurer and the insured"; laws of general applicability that have only some

9    bearing on insurers do not qualify.  *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329,

10   334, 341-42 (2003).

11       In enacting the enforcement provisions of ERISA, 29 U.S.C. § 1132, Congress clearly expressed

12   an intent that those provisions be the exclusive vehicle for actions by ERISA-plan participants and

13   beneficiaries asserting improper processing of claims for benefits, and that varying state law causes

14   of action for claims within the scope of 29 U.S.C. § 1132 would pose an obstacle to the purposes and

15   objectives of Congress.  *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52 (1987); *see also New

16   York State Conference of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657

17   (1995).  Accordingly, the Ninth Circuit has "held that state laws of insurance policy interpretation

18   do not qualify for the saving[s] clause exception and are preempted."  *Evans v. Safeco Life Ins. Co.*,

19   916 F.2d 1437, 1439 (9th Cir. 1990) (citing *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489,

20   494 (9th Cir. 1988)); *see id.* ("[T]he interpretation of ERISA insurance policies is governed by a

21   uniform federal common law."); *see also McClure v. Life Ins. Co. of N. America*, 84 F.3d 1129,

22   1133-34 (9th Cir. 1996) ("Under ERISA, state law does not control the construction of the [benefits]

23   policy.").  For this reason, courts in this Circuit have found that the *Erreca* standard does not apply

24   in ERISA cases.  *See Ramos v. United Omaha Life Ins. Co.*, No. C 12-3761 PJH, 2013 WL 60985, at

25   *5-7 (N.D. Cal. Jan. 3, 2013) ("[T]he court finds that California's definition of 'total disability' is

26   not applicable to an ERISA disability insurance policy."); *Brady v. United Omaha Life Ins. Co.*, No.

27   C-12-2245 EMC, 2012 WL 3583033, at *5-7 (N.D. Cal. Aug. 20, 2012) (finding "the California law

28   on this matter" to be preempted by ERISA); *Finkelstein v. Guardian Life Ins. Co. of America*, No. C

07-01130 CRB, 2008 WL 8634992, *8 (N.D. Cal. Nov. 23, 2008) ("Finkelstein's argument that California's definition of 'total disability' should apply here is unavailing."); *Leick v. Hartford Life & Acc. Ins. Co.*, 2008 WL 1882850, at *5 (E.D. Cal. Apr. 24, 2008) ("Under ERISA, state law does not control the construction of the [benefits] policy . . . Plaintiff must demonstrate she is 'totally disabled' under the definition in the Policy."); *Tavor v. Aetna Life Ins. Co.*, 2008 WL 622019 at * 8 (D. Ariz. Mar. 4, 2008) (rejecting plaintiff's argument that "total disability" should be defined using California law, and finding that defendant "Aetna's use of the Plan definition was therefore proper"); *see also Buchanan v. Standard Ins. Co.*, No. 05-16651, unpublished slip copy, 2007 WL 2988756, at * 1 (9th Cir. Oct.15, 2007) ("The district court properly held Nevada state law does not govern the interpretation of the term "total disability" in Standard Insurance's long term disability policy.  The interpretation of terms in an ERISA insurance policy is governed by federal common law, not state law.") (citations omitted).[8]

Ms. Smith contends that the Ninth Circuit's decision in *Hangarter v. Provident Life and Accident Ins. Co.* suggests otherwise, but that action was a diversity breach of contract case and did not involve ERISA claims.  373 F.3d at 1003; *see also McGregor v. Paul Revere Life Ins. Co.*, 92 Fed. Appx. 412, 415 (9th Cir. 2004) (applying *Erreca* definition of "total disability" in a non-ERISA case); *Scammacca v. Royal Maccabees Life Ins. Co.*, 9 Fed. Appx. 608, 609 (9th Cir. 2001) (same). And if that is not enough, the Ninth Circuit even noted in a footnote in its decision that had the insurance policy at issue been a "part of an employee welfare benefit plan governed by ERISA, then [the] plaintiff's state law claims relating to that policy [would be] preempted and federal law [would apply] to determine recovery." *Id.* at 1011 n.8.

Based on this authority, and the reasoning therein, the court finds that the California law standard of "total disability" that is found in *Erreca* is preempted.

Ms. Smith also argues that the Policy's choice of law provision, which states that the Policy is

---

[8] The court is aware of one case where the district court applied the *Erreca* standard in an ERISA case, but in that opinion the court did not discuss the preemption issue at all.  *See Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 970 n.5 (C.D. Cal. 2005).  The court thus finds it unpersuasive.

"governed by the laws of the state where it is delivered"—and it was delivered in

California—requires that the California law definition be applied here.  The court disagrees.  It is

true that in some circumstances courts have applied state law to ERISA policies because of valid and

enforceable choice of law provisions, but none of those circumstances are present here.  In *Wang*

*Laboratories, Inc. v. Kagan*, 990 F.2d 1126 (9th Cir. 1993), the Ninth Circuit determined that a

choice of law provision governed the applicable statute of limitations because neither ERISA nor the

terms of the policy provided it.  990 F.2d at 1128-29.  Similarly, in *Capone v. Aetna Life Ins. Co.*,

592 F.3d 1189 (11th Cir. 2010), and *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133 (11th Cir. 2001),

upon which Ms. Smith primarily relies, the Eleventh Circuit applied choice of law provisions to

apply Georgia's "accidental means" doctrine in interpreting the undefined phrase "caused by an

accident" in the policies at issue in those cases.  *Capone*, 592 F.3d at 1196-1200; *Buce*, 247 F.3d at

1141-49.  Here, however, Ms. Smith asks the court to substitute the *Erreca* standard of "total

disability" for the Policy's own "any occupation" disability standard.  This is not proper because

ERISA requires Hartford to apply the terms of the Policy, and among those terms is the "any

occupation" disability standard.  *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term*

*Disability Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996) ("An ERISA plan administrator abuses its

discretion if it construes provisions of the plan in a way that 'conflicts with the plain language of the

plan.'") (citing *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1472 (9th Cir. 1993); *see* 29 U.S.C.

1132(a)(1)(B) (The beneficiary of an ERISA plan may bring a civil action against a plan

administrator "to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.").  Unlike

*Wang Laboratories*, *Buce*, or *Capone*, this is not an instance where the court must look outside of

the Policy or ERISA and turn to state law to interpret undefined or ambiguous terms.  *See*

*Shemano-Krupp v. Mutual of Omaha Ins. Co.*, No. C 05-04693 JSW, 2006 WL 3365595, at *5 (N.D.

Cal. Nov. 20, 2006) (finding that a choice of law provision within an ERISA policy applied only "in

the context where preemptive federal law does not provide explicit guidance"); *id.* at *5 n.1

(distinguishing *Buce* because it "held that only in the absence of ERISA statutory or common law on

the issue of . . . the ambiguity of an accidental death benefit provision, and where the application of

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Georgia law would not subvert the policies of ERISA, the choice of law provision should guide the

2    court's determination of the subject analysis").  Rather, as explained above, the Policy provides an

3    explicit disability standard, and ERISA requires that the Policy be enforced according to its terms.

4        For these reasons, the court rejects Ms. Smith's arguments that the *Erreca* standard be applied in

5    favor of the "any occupation" disability standard that is found in the Policy.

6        **B. Whether Hartford Abused Its Discretion**

7            *1. Legal Standard*

8        When reviewing for abuse of discretion, the court "cannot substitute [its] judgment for the

9    administrator's . . . [and] can set aside the administrator's discretionary determination only when it

10   is arbitrary and capricious."  *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d 869, 875

11   (9th Cir. 2004), *overruled on other grounds by Abatie*, 458 F.3d at 969.  "Applying a deferential

12   standard of review . . . does not mean that the plan administrator will prevail on the merits[,] . . . [but

13   rather] means only that the plan administrator's interpretation of the plan 'will not be disturbed if

14   reasonable.'"  *Conkright v. Frommert*, ---U.S. ----, 130 S.Ct. 1640, 1651, 176 L.Ed.2d 469 (2010)

15   (quoting Firestone, 489 U.S., at 111, 109 S.Ct. 948, 103 L.Ed.2d 80).  "An ERISA administrator

16   abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of

17   the plan in a way that conflicts with the plain language of the plan or (3) relies on clearly erroneous

18   findings of fact."  *Boyd v. Bert Bell/Pete Rozelle N.F.L. Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir.

19   2005).  A court may find clear error "when the reviewing court is left with the definite and firm

20   conviction that a mistake has been committed.'"  *Linich v. Broadspire Services, Inc.*, No.

21   CV–05–2983–PHX–MHM, 2009 WL 775471, at * 2 (D. Ariz. Mar. 23, 2009) (quoting *Concrete

22   Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993)).

23   In *Salomaa v. Honda Long Term Disability Plan*, the Ninth Circuit held that in determining whether

24   this standard is met, the court should consider "whether application of a correct legal standard was

25   '1) illogical, 2) implausible, or 3) without support in inferences that may be drawn from the facts in

26   the record.'"  642 F.3d 666, 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir.

27   2009)).

28       In the absence of a conflict of interest, "the plan administrator's decision can be upheld if it is

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   'grounded on any reasonable basis.'" *Montour v. Hartford Life & Accident Ins. Co.*, 582 F.3d 933,

2   940 (9th Cir. 2009) (quoting *Sznewajs v. Bancorp Amended & Restated Supplemental Benefits Plan*,

3   572 F.3d 727, 734-35 (9th Cir. 2009)).  Nevertheless, if the same entity both pays the benefits and

4   evaluates the claims, there is a "structural conflict of interest" and a more complex analysis is

5   required.  *Id*.  A court can give more or less weight to a conflict depending on what the other

6   evidence shows.  *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th

7   Cir. 2008).  A court can "view the conflict with a low level of skepticism if there's no evidence of

8   malice, of self-dealing, or of a parsimonious claims-granting history."  *Id*.  However, the court "may

9   weigh the conflict more heavily if there's evidence that the administrator has given inconsistent

10  reasons for denial, has failed adequately to investigate a claim or ask the plaintiff for necessary

11  evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms

12  incorrectly."  *Id*.

13          *2.  Analysis*

14                  *(a)  Hartford Has A Conflict of Interest*

15      There is a structural conflict in this case, as Hartford has the discretion to deny benefits that it

16  would have to pay.  *See Bardill v. Lincoln Nat. Life Ins. Co.*, No. C 09-03025 CRB, 2011 WL

17  891141, at *5 (N.D. Cal. Mar. 15, 2011).  To decide how much weight to give this conflict, the

18  court, as explained above, must look to several factors.  *See Saffon*, 522 F.3d at 868.  On one hand,

19  there is evidence that shows that Hartford did not wall off its claims personnel from knowing how

20  much money Hartford had in its claims reserves.  *See* AR 683, 717; Plaintiff's Opening Brief, ECF

21  No. 26 at 33 (attaching Hartford's privilege log that identifies redacted portions of AR 683 and 717

22  as "reserves"); *cf. Metro. Life Ins. Co. v. Glenn* ("*MetLife II*"), 554 U.S. 105, 117-18 (2008) (the

23  conflict will prove less important where "where the administrator has taken active steps to reduce

24  potential bias and to promote accuracy, for example, by walling off claims administrators from those

25  interested in firm finances").[9]  And, as discussed in more detail below, Hartford also did not conduct

27          [9] The court notes that Hartford did not respond to this point in any of the briefing it
    submitted.  *See* Hartford's Opening Brief, ECF No. 27; Defendant's First Reply Brief, ECF No. 37;
28  Defendant's Second Reply Brief, ECF No. 45.  But when the court raised Ms. Smith's argument at

C 11-03495 LB
FINDINGS OF FACT AND CONCLUSIONS OF LAW

UNITED STATES DISTRICT COURT
For the Northern District of California

1   any in-person examinations of Ms. Smith and did not discuss some of the evidence she submitted in

2   support of her appeal in its termination of benefits letter.  *Cf. Bardill*, 2011 WL 891141 at *5 (giving

3   low weight to conflict where the defendant, in addition to relying upon the plaintiff's medical

4   history, also conducted two in-person medical examinations and considered the plaintiff's additional

5   submissions and Social Security disability benefits award).  On the other hand, there is no evidence

6   that Hartford acted with malice, has a "parsimonious claims-granting history," or gave Ms. Smith

7   inconsistent reasons for the denial of her waiver of life insurance claim.  On these facts, the court

8   gives the conflict a moderate amount of weight.

9                    *(b)  Hartford Abused Its Discretion*

10       With this moderate conflict in mind, the court now must determine whether Hartford abused its

11   discretion in denying Ms. Smith's waiver of life insurance benefit.  To do so, the court must

12   consider, along with the conflict, other factors, such as (1) "the quality and quantity of the medical

13   evidence," (2) "whether the plan administrator subjected the claimant to an in-person medical

14   evaluation or relied instead on a paper review of the claimant's existing medical records," (3)

15   "whether the administrator provided its independent experts 'with all of the relevant evidence[,]'"

16   and (4) "whether the administrator considered a contrary SSA disability determination, if any."

17   *Montour*, 582 F.3d at 940 (citations and footnote omitted).

18       Ms. Smith attacks Hartford's decision on numerous grounds.  First, she argues that Hartford's

19   doctors did not evaluate her physical and mental limitations in conjunction with each other.

20   Plaintiff's Opening Brief, ECF No. 26 at 22-23.  Citing two California district court opinions, she

21   maintains that Hartford should have had its doctors "globally assess the impact of Ms. Smith's

22   co-morbid conditions in context."  *Id*. at 23 (citing *Creer v. AT&T Umbrella Benefit Plan No. 1*, No.

23

24   _____

25   the trial, Hartford responded that it did not matter that the amounts in the claims reserves were
     known because that information (1) is not considered by its claims personnel and (2) is of little

26   consequence in so-called "first-party" insurance claims between an insured and his or insurer.  The
     court is not persuaded by these arguments, though, in light of the U.S. Supreme Court's statement in

27   *MetLife II*—itself an action involving a "first-party" insurance claim—that a structural conflict may
     prove less important where an insurer has walled off its claims administrators from the insurer's

28   finances.  *See* 554 U.S. at 117-18.

1   2:09–cv–02210–MCE–CKD, 2012 WL 397717, at *5 (E.D. Cal. Feb. 7, 2012); *Toven v. Metro. Life.*

2   *Ins. Co.*, No. CV 06-7260 ABC (RZx), 2008 WL 5101727, at *11-12 (C.D. Cal. Dec. 2, 2008)).  It is

3   true that district courts in *Toven* and *Creer* (which followed *Toven*) found that it was an abuse of

4   discretion for plan administrators to base their decisions to deny disability benefits on opinions from

5   doctors who never considered the claimants' limitations as a whole, and this makes sense given that

6   it may be a claimant's combination of limitations that renders her or her disabled.  *See Creer*, 2008

7   WL 397717, at *5 ("It was, per se, unreasonable for Defendant Plan to rely on piecemeal evaluations

8   that not only failed to consider Plaintiff's symptomatology as a whole, but also pointed to necessary

9   evaluations . . . that never occurred."); *Toven*, 2008 WL 5101727, at *12 ("It may be that none of

10  Plaintiff's health problems was disabling on its own, but whether the particular combination of

11  problems he had might together be disabling is a different question—one that was not sufficiently

12  addressed.").  Indeed, as the court in *Toven* explained:

13          The failure to investigate or evaluate Plaintiff's vision issues is really just one part
        of a larger problem, though.  That is, MetLife does not appear to have considered the
14      global nature of Plaintiff's health concerns.  Although MetLife obtained two
        independent physician evaluations, neither doctor was asked to, or did, examine the
15      overall state of Plaintiff's health.  Rather, discrete issues were carved out for each
        doctor to review in isolation.  Dr. Mitzner evaluated Plaintiff's diabetes, and opined
16      solely on Plaintiff's ability to function from "an endocrinologic/glycemic
        perspective."  (AR 22.)  Dr. Polsky evaluated only the psychiatric issues, and did not
17      evaluate Plaintiff's physical condition.  (AR 26.)  Thus, no doctor reviewed the
        problems Plaintiff had had with his hands and feet as a result of either neuropathy
18      and/or carpal tunnel syndrome.  Likewise, no one addressed the fact that Plaintiff's
        treating physician had noted Plaintiff could not "twist/bend/stoop" or "reach above
19      shoulder level" (AR 48).  These concerns become even more important in light of the
        job description no doctor ever saw, which, as MetLife noted in its final denial letter,
20      indicated that "[m]uch of the time is spent walking, observing, reaching, bending,
        stooping, lifting (minimum of 35 pounds), and standing with intermittent pulling,
21      pushing, climbing and kneeling" (AR 15).  Despite the fact that neither of the
        independent physicians was asked to evaluate the full picture, or was provided with
22      Plaintiff's job description, MetLife's final denial letter nonetheless stated that
        "[n]either of the IPC's [sic] was able to identify objective evidence or proof of an
23      impairment that would have precluded you from performing the duties of your
        occupation."  (AR 17.)

24

25  *Toven*, 2008 WL 5101727, at *11.

26      But here, it appears that Hartford's doctors did consider Ms. Smith's physical and psychological

27  limitations together.  For example, although Dr. Rangaswamy primarily commented on Ms. Smith's

28  physical limitations (which makes sense, given that Dr. Rangaswamy is a hand surgeon), before

UNITED STATES DISTRICT COURT
For the Northern District of California

1  rendering her conclusion she discussed Ms. Smith's conditions with Dr. Rater (a psychologist), who

2  told her that there was "no evidence of any psychiatric issues that would prevent [Ms. Smith] from

3  working." AR 1392, 1393.  Dr. Rater, in turn, spoke to Dr. Rangaswamy about Ms. Smith's

4  physical limitations before rendering his opinion. AR 1395.  She told him that Ms. Smith's "type of

5  injury is usually treated with a return to work within several weeks" and "did not find support for

6  any condition that prevented Ms. Smith from returning to her previous sedentary position." AR

7  1395.  And Dr. Rater even discussed the medical records concerning Ms. Smith's physical

8  limitations in his opinion. AR 1396-97.  Dr. Lobel (a physical medical and rehabilitation specialist

9  ), too, reviewed medical records related to both Ms. Smith's psychological and physical limitations,

10  AR 490-91, and he also spoke to Dr. Marks (a psychiatrist), who told him that Ms. Smith "has no

11  psychiatric impairment that would add to the restrictions and limitations from a Pain/PMR

12  standpoint," AR 491.  And Dr. Marks also reviewed medical records concerning Ms. Smith's

13  physical limitations, AR 479-80, and spoke to Dr. Lobel, who told him that Ms. Smith "can return to

14  work[,] perhaps with some restrictions, but this would depend[] on [Dr. Lobel's] final assessment,"

15  AR 480.

16      This is sufficient.  This is not a situation where Hartford's doctors were entirely unaware of Ms.

17  Smith's limitations that did not coincide with their specialties (*e.g.*, Dr. Marks was not given

18  information only about Ms. Smith's psychological limitations).  Rather, each of the doctors spoke to

19  another doctor in a different field to get an understanding of the totality of Ms. Smith's limitations

20  (*e.g.*, Dr. Marks, a psychiatrist, spoke to Dr. Lobel, a physical medical and rehabilitation specialist).

21  And to the extent that Ms. Smith argues that Hartford's doctors did not provide a medical opinion

22  concerning her limitations that are outside of their specialties, this argument is unpersuasive because

23  it would not make sense to have a hand surgeon provide a medical opinion about Ms. Smith's

24  psychological well-being.  Accordingly, the court rejects Ms. Smith's first argument and finds that

25  Hartford's doctors sufficiently evaluated her physical and mental limitations in conjunction with

26  each other.

27      Second, Ms. Smith points out that Hartford's doctors never conducted an in-person medical

28  examination of her and instead simply relied upon a review of her medical records.  Plaintiff's

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Opening Brief, ECF No. 26 at 31.  Even though the Policy does not require Hartford to hire doctors

2    to give Ms. Smith an in-person examination, *see* AR 1021-41, not doing so "raise[s] questions about

3    the thoroughness and accuracy of the benefits determination."  *Bennett v. Kemper Nat'l Servs., Inc.*,

4    514 F.3d 547, 554 (6th Cir. 2008) (quotation marks omitted); *see Montour*, 588 F.3d at 634 (citing

5    *Bennett* for this point).[10]  And while Dr. Rangaswamy, Dr. Rater, Dr. Lobel, and Dr. Marks viewed

6    the video surveillance of Ms. Smith running errands over the course of four days in September and

7    October of 2009, this is no substitute for an actual in-person medical examination.  Indeed, the Ninth

8    Circuit expressed skepticism when presented with opinions from medical doctors who relied heavily

9    on video surveillance that showed a claimant engaging in discrete activities for short periods of time,

10   especially where the claimant was limited from performing those or similar activities for prolonged

11   periods of time.  *See Montour*, 588 F.3d at 633 ("[T]hat Plaintiff could perform sedentary activities

12   in bursts spread out over four days does not indicate that he []is capable of sustaining activity in a

13   full-time occupation.").

14       This failure is particularly significant when a claimant has psychological limitations.  In finding

15   a plan administrator's procedures for reviewing a claimant's claim to be lacking, one district court

16   observed:

17         Courts routinely discount or entirely disregard the opinions of psychiatrists who
           had not examined the individual in question at all or for only a limited time.  *See, e.g.*,
18         *People v. Espinoza*, 95 Cal. App. 4th 1287, 116 Cal. Rptr. 2d 700, 718-19 (2002) (in
           a prosecution for molestation of a child, "L," where defendant "proposed to introduce
19         testimony by a psychiatrist who had never examined L. that L. did not suffer from
           any mental illnesses diagnosed by any of the psychiatrists who actually examined
20         her," appellate court affirmed trial court's ruling that "the proffered evidence was
           speculative and therefore had little probative value") (emphasis added); *Campbell v.*
21         *United States*, 307 F.2d 597, 598 (D.C. Cir. 1962) ("Appellant says, and we agree,
           that the testimony of the psychiatrist relied upon by the Government was of little
22         probative value.  The psychiatrist had no information about the defendant's mental
           condition, testified largely in terms of a legal conclusion, and had never seen
23         defendant prior to the trial.") (emphasis added); *Rollerson v. United States*, 343 F.2d
           269, 270 (D.C. Cir. 1964) ("[W]e think it necessary to point out that the value of a
24         psychiatrist's testimony depends largely upon his opportunities for observation and
           the facts he observes.") (emphasis added); *Jones v. United States*, 327 F.2d 867,

25

26       _____

27       [10] Hartford did not address its decision not to conduct an in-person examination of Ms. Smith
         in any of its briefs, and although Hartford stated at oral argument that there are judicial opinions
28       finding that the failure to conduct an in-person examination not to be an abuse of discretion, it did
         not cite any of them to the court.

UNITED STATES DISTRICT COURT
For the Northern District of California

879-80 (D.C. Cir. 1963) ("Here the psychiatric evaluation apparently took but a few seconds and was limited to observing the patient during that time through prison bars"; report of psychiatric panel that defendant was mentally competent based upon so limited an observation "would not, in any event, be a predicate for any such adjudication") (concurring opinion).

Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms: in Sheehan's case, as described by Dr. Prati, depression, fear of death, and anxiety, among others. Physicians do not diagnose or evaluate these different conditions in the same way. It matters not if a patient with ischemia, ventricular scarring, or atrial fibrillation is depressed or elated; an echocardiogram or stress test will reveal his condition. It matters not if a patient with arthritic spinal degeneration or scoliosis fears death or believes himself immortal; an x-ray or MRI will reveal his condition. But surely Dr. Prati was right in testifying that when a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," Tr. 145, a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.

*Sheehan v. Metro. Life. Ins. Co.*, 368 F. Supp. 2d 228, 254-55 (S.D.N.Y. 2005); *see Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed. Appx. 495, 508 (6th Cir. 2008) ("The failure of the administrator to take advantage of [its right to order physical examinations and therapy sessions for the plaintiff], especially when faced with a claim of mental and emotional instability, is both puzzling and troubling for the very reason identified not only by the district court in this litigation, but also by the District Court for the Southern District of New York in [*Sheehan*]."); *Winkler v. Metro. Life Ins. Co.*, 170 Fed. Appx. 167, 168-69 (2d Cir. 2006) ("MetLife's exclusive reliance on second-hand opinions adds to the overall picture of its decision as less than fair. First-hand observation is especially important in the context of assessing psychiatric disabilities.") (citing *Sheehan*). The court finds this reasoning to be persuasive, and Hartford cites no authority to the contrary. Hartford's failure to conduct an in-person examination of Ms. Smith, then, favors a finding that it abused its discretion. *See Kroll v. Kaiser Found. Health Plan Long Term Disability Plan*, No. C 09-01404 JSW, 2011 WL 1225737, at *6, *8 (N.D. Cal. Mar. 31, 2011) (finding that plan administrator abused its discretion, in part because its doctors did not conduct an in-person examination of the claimant).

Third, Ms. Smith argues that either Hartford did not provide its doctors with all of the relevant evidence or its doctors failed to consider all of it. Plaintiff's Opening Brief, ECF No. 26 at 25-29.

1   Specifically, Ms. Smith says that none of Hartford's doctors addressed or mentioned the Dr. Pang's

2   report, the ALJ's findings that supported the award of Social Security disability benefits, Mr.

3   Brodzinsky's report, or Ms. Smith's appeal letter or her declaration in support of it.  Plaintiff's

4   Opening Brief, ECF No. 26 at 25.

5        Dr. Rangaswamy and Dr. Rater both stated that "[a]ll medical records provided by The Hartford

6   were reviewed," but they did not specifically state which records that Hartford in fact provided.  AR

7   1392, 1395.  While Dr. Pang's report may have been included in these records (because Dr. Pang

8   provided his opinion in November 2009 and Dr. Rangaswamy and Dr. Rater provided their opinions

9   in March 2010), the records could not have included the ALJ's findings that supported the award of

10  Social Security disability benefits, Mr. Brodzinsky's report, or Ms. Smith's appeal letter or her

11  declaration in support of it (because these documents were created after Dr. Rangaswamy and Dr.

12  Rater provided their opinions).  Still, nowhere in Dr. Rangaswamy's or Dr. Rater's opinion do they

13  refer to or discuss Dr. Pang's opinion.  *See* AR 1391-94, 1395-99.  This is a bit odd considering that

14  Dr. Rangaswamy, in her "Summary of Records," specifically discussed records of Dr. Cable and Dr.

15  Stevenson (including records of Dr. Stevenson from as late as November 29, 2009), AR 1393-94,

16  and Dr. Rater, in his "Summary of Records," specifically discussed records of the Novato

17  Community Hospital, the Prima Medical Group, Dr. Cable, Dr. Stevenson, Dr. Rosenblatt, and Dr.

18  Nadler, AR 1396-97.  While it is not Hartford's burden to come forth with evidence proving the

19  truth of Dr. Rangaswamy's and Dr. Rater's blanket statements that they reviewed everything, *see*

20  *Moskowite*, 2005 WL 1910941, at 8 n.12, Dr. Lobel's and Dr. Marks's failures to address evidence

21  that is contrary to their conclusions could suggest that they may not have been aware of it, *see*

22  *Montour*, 588 F.3d at 634 ("[N]either of Hartford's professional experts mentioned the SSA's

23  contrary conclusion, 'not even to discount or disagree with it, which indicates that [they] may not

24  even have been aware of it.'") (quoting *Glenn v. Metro. Life. Ins. Co.* ("*MetLife I*"), 461 F.3d 660,

25  669 (9th Cir. 2006)) (internal quotation marks and alterations omitted).

26       Unlike Dr. Rangaswamy and Dr. Rater, Dr. Lobel and Dr. Marks provided their opinions after

27  both Dr. Pang issued his report and Ms. Smith made her appeal.  They, too, both state that they

28  reviewed "all information, records[,] and data provided . . . by The Hartford Life Insurance

1   Companies." AR 480, 490.  In the "Clinical Summary" and "Review Data" sections of his report,

2   Dr. Lobel discusses, or at least mentions, medical records from Dr. Kalra, Dr. Cable, Dr. Stevenson,

3   and Dr. Nadler, but nowhere does he mention Dr. Pang's report, the ALJ's findings that supported

4   the award of Social Security disability benefits, Mr. Brodzinsky's report, or Ms. Smith's appeal

5   letter or her declaration in support of it.  AR 489-91.  Dr. Marks's report is similar.  In the "Clinical

6   Summary" and "Review Data" sections of his report, he discusses, or at least mentions, medical

7   records from Dr. Nadler and Dr. Forrester, but nowhere does he mention Dr. Pang's report, the

8   ALJ's findings that supported the award of Social Security disability benefits, Mr. Brodzinsky's

9   report, or Ms. Smith's appeal letter or her declaration in support of it.  AR 479-80.

10      Given that Hartford's doctors at least mentioned many of the records they reviewed but they did

11  not mention Dr. Pang's report, the ALJ's findings that supported the award of Social Security

12  disability benefits, Mr. Brodzinsky's report, or Ms. Smith's appeal letter or her declaration in

13  support of it, the court finds that these omissions also favor a finding that it abused its discretion.

14      Fourth, Ms. Smith also argues that Hartford did not consider her award of Social Security

15  disability benefits and, in fact, is judicially estopped from terminating her waiver of life insurance

16  premium benefit because Hartford requested that she apply for these benefits and "closely monitored

17  and was intimately involved in" the application process.  Plaintiff's Opening Brief, ECF No. 26 at

18  18-22.  First, the court disagrees with Ms. Smith's judicial estoppel argument.  Ms. Smith's attorney

19  made this same argument to Judge Chesney of this District, who rejected it.  *See Moskowitz v.*

20  *Everen Capital Corp.*, No. C-03-4666 MMC, 2005 WL 1910941, at *4 (N.D. Cal. Aug. 10, 2005).

21  As Judge Chesney explained and reasoned:

22          A decision by the SSA to award a claimant Social Security benefits is not binding
        on a plan administrator.  *See, e.g., Madden v. ITT Long Term Disability Plan*, 914 F.
23      2d 1279, 1285 (9th Cir. 1990) (affirming plan administrator's decision denying
        disability benefits, even though claimant received SSA benefits, because claim file
24      contained evidence in support of plan administrator's decision); *Calvert v. Firstar
        Finance, Inc.*, 266 F. Supp. 2d 578, 585-86 (W.D. Ky.) (noting one reason SSA
25      decisions are not binding on plan administrators is that SSA applies "treating
        physician rule" while plan administrators are not limited thereby).

26
            Further, plaintiff cites no case, and the court has located none, in which a court
27      has determined a claimant to be entitled to plan benefits solely because the plan
        administrator encourages a claimant to apply for SSA benefits and thereafter offsets
28      plan benefits by SSA benefits.  Rather, courts have held such conduct "'does not

C 11-03495 LB
FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                            34

UNITED STATES DISTRICT COURT
For the Northern District of California

1    provide an independent basis'" for judgment in favor of the claimant.  *See Darland v.*
2    *Fortis Benefits Ins. Co.*, 317 F.3d 516, 530, 533 (6th Cir. 2003) (quoting *Ladd v. ITT*
     *Corp.*, 148 F. 3d 753, 755-56 (7th Cir. 1998)).

3    *Moskowitz*, 2005 WL 1910941, at *4.  Here, Ms. Smith cites only general judicial estoppel

4    principles in support of her argument; she does not cite to any authority where a court held that a

5    claimant entitled to plan benefits solely because the plan administrator encourages a claimant to

6    apply for SSA benefits and thereafter offsets plan benefits by SSA benefits.  The court also has

7    found none.  For this reason, the court follows Judge Chesney's reasoning and rejects Ms. Smith's

8    judicial estoppel argument.

9         Whether Hartford properly considered the award of Social Security disability benefits is a

10   different question.  Indeed, as Judge Chesney also noted, a denial of benefits by a plan administrator

11   after the Social Security Administration awards benefits may be deemed "inconsistent" and may

12   "cast[] additional doubt on the adequacy of [the plan's] evaluation of [the plaintiff's] claim."

13   *Moskowitz*, 2005 WL 1910941, at *4 n.5 (citing *Dorland*, 317 F.3d at 530; *Ladd* 148 F.3d at 756).

14   "While ERISA plan administrators are not bound by the SSA's determination, complete disregard

15   for a contrary conclusion without so much as an explanation raises questions about whether an

16   adverse benefits determination was 'the product of a principled and deliberative reasoning process.'"

17   *Montour*, 588 F.3d at 635 (quoting *MetLife I*, 461 F.3d at 674); *see also MetLife II*,128 S.Ct. at

18   2352; *cf. id.* at 2361 (Scalia, J., dissenting).  "In fact, not distinguishing the SSA's contrary

19   conclusion may indicate a failure to consider relevant evidence."  *Montour*, 588 F.3d at 635 (citing

20   *MetLife II*, 128 S.Ct. at 2355 (Roberts, C.J., concurring in part and concurring in the judgment)).

21        Here, the Policy required Ms. Smith to apply for Social Security disability benefits and, if

22   denied, to exhaust all possible appeals.  AR 1016.  Hartford emphasized this requirement several

23   times.  *See*, *e.g.*, AR 208, 228-29, 230-31, 234-35.  And after Ms. Smith was awarded Social

24   Security disability benefits, Hartford, in its letter denying her waiver of life insurance premium

25   benefits, addressed the SSA's decision by acknowledging its existence and by noting some of the

26   standards which bind the SSA but do not bind Hartford (*e.g.*, ALJs must give greater weight to the

27   opinions of treating physicians than non-treating physicians).  AR 759.  "Ordinarily," however, "a

28   proper acknowledgment of a contrary SSA disability determination would entail comparing and

C 11-03495 LB
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   contrasting not just the definition employed but also the medical evidence upon which the

2   decisionmakers relied." *Montour*, 588 F.3d at 636 (citing *MetLife I*, 461 F.3d at 668).  Hartford

3   never did this.  Thus, particularly where "a plan administrator operating with a conflict of interest

4   requires a claimant to apply [for,] and then benefits financially from[,] the SSA's disability finding,"

5   Hartford's failure to really "grapple with the SSA's contrary disability determination" is another

6   factor that supports a finding that Hartford abused its discretion.  *Montour*, 588 F.3d at 635, 637.

7

8       Finally, the court addresses the argument that Hartford emphasized during oral argument: that

9   there simply is not sufficient evidence to support a finding that Ms. Smith is disabled under the

10  extremely broad "any occupation" standard that is found within the Policy.  It is true that the

11  Policy's "any occupation" standard is broad and includes even occupations for which Ms. Smith

12  could become qualified, and it is true that the Ninth Circuit has described such a standard as "not

13  demanding." *McKenzie v. General Telephone Co. of California*, 41 F.3d 1310, 1317 (9th Cir. 1994);

14  *see Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008).  But it

15  also is true that Hartford previously found that Ms. Smith met this "not demanding" standard, when

16  it initially approved her claim for waiver of life insurance premium benefits.  *See* AR 873-74.

17  Indeed, it was only after (1) Hartford's investigators surveilled her over four days in September and

18  October 2009 and saw that she, for example,  "boarded and exited a vehicle, drove, walked, stood,

19  loaded groceries, pushed a shopping cart, walked a dog on a leash, and moved about in an apparent

20  normal manner," AR 1455, (2) Dr. Rangaswamy, Dr. Rater, Dr. Lobel, and Dr. Marks conducted

21  their paper reviews of many, but not all, of Ms. Smith's medical records, and (3) acknowledged, but

22  did not grapple with, a contrary decision by the SSA, that Hartford determined that Ms. Smith no

23  longer met the "any occupation" standard.  Accordingly, the court rejects Hartford's argument and

24  finds, in light of the moderate weight given to Hartford's structural conflict of interest, that Hartford

25  abused its discretion by terminating Ms. Smith's waiver of life insurance premium benefit.

26  **C. The Appropriate Remedy Is An Award of Benefits**

27      Based on all of the considerations discussed above, the court concludes that Hartford abused its

28  discretion when it terminated Ms. Smith's waiver of life insurance premium benefits effective March

31, 2010.  *See* AR 767.  Therefore, the court finds that a retroactive award of benefits is proper.  *See Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.") (affirming district court's award of benefits and denial of request to remand for determination thereof where disability insurer abused discretion by terminating benefits); *see also Pannebecker*, 542 F.3d at 1221 (explaining that "[w]here an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance . . . [b]ut if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions").

### CONCLUSION

Hartford abused its discretion by terminating Ms. Smith's waiver of premium benefit.  The court orders Hartford to reinstate it retroactively to March 31, 2010.  The court also directs the parties to meet and confer within 14 days regarding reasonable attorneys' fees and costs that should be awarded.  If the parties are unable to reach agreement on these issues, within 30 days of the date of this order, Ms. Smith should file a motion setting forth any unresolved issues.   Hartford's opposition is due 14 days later, and  Ms. Smith's optional reply is due 7 days after the opposition is filed.  If the parties resolve the issues, they should advise the court within 30 days.

**IT IS SO ORDERED.**

Dated: January 30, 2013

_____
LAUREL BEELER
United States Magistrate Judge